The case before us today is the United States v. Joseph Management and SDH Properties. The United States has waived oral arguments, so we will start oral argument with the Josephson Management and Sushi Deli side. So whoever would like to start first among the two co-appellants is fine with the court. Where are you, sir? May it please the court. Louis E. Goble appearing on behalf of Sushi Deli. How are you and your co-counsel going to split the time between you? We're going to split it half and half, and I would request to reserve five minutes of my 10 minutes for rebuttal. Just watch the clock. Oh, I'm sorry. As the clock is, is a is a countdown clock. It should be right there to your right. And that tells you the number of seconds and minutes and seconds that are remaining. We're going to start quickly and have a lead to my opening opening remarks. Is it that we have briefed the matter? And I'm not going to go through the briefing, but I'd like to jump around a little bit and hit some of the points that perhaps are a little more practical and can be additional help beyond the briefing. Are you and Josephson in the same position, except to the extent you have different leases? Is that essentially where you are in terms? Yes. You've anticipated one of my one of my despite my being a colleague of the council here. We are different in one in one respect. Our leases. And of course, we believe that our lease is clear and more compelling. Not to degrade bears in any way, but it just seems to be black and white that we were entitled to a proportion of the overall pie, so to speak. And that's that's my next step is that as as I think the courts learn, but just to just to reinforce it, reinforce it. These these cases go into two phases and the first phase is effectively to create the pie. And when the price created the taker, which in this case happens to be the government, it's free to leave. And then the second phase goes to the remaining parties to split the pie, cut it up into pieces. And happily for both myself and my counsel here, there wasn't any splitting of the pie. The owner, latecoming owner to Tibet, Tibet, Tibet took the whole thing. Well, the United States makes this condemnation award to the owner of the building. And then the question is, to what extent that award should be allocated after it's received by the landlord between the landlord and the tenant. That's what we're dealing with. Well, I would differ just slightly with that. Your Honor, I'd like to clarify. It was sharpened up a little bit. The idea is that the entire fee interest is being valued. Right. As if it were we're breaking. Yes. And then then then the parties are better on your right on it. You go on and divide it up. And in some cases there may be situations where the division is non contractual. But in this case, at least that's the sushi deli. The division was contractual. And, you know, I'm sure you've gone through the language there that shows it. We were entitled to pro rata share of the pie that had been created. That's in 17B of the lease. Yes. And actually, I think that the trial judge even recognized that at one point in his decision. Unfortunately, 10 pages later, he got kind of off the back off the track a little bit. Well, where exactly did Judge Singleton go wrong in looking back? In effect, going back to the first phase of the of the trial, making the pie and making a judgment about whether this building was how long this building was going to last. We had a pot. We had a pie here and his job. And that was that was the pie was created by, in this case, not by trial, but by a settlement. The owner settled with the government. So we have the pie. He doesn't. He doesn't. He's not really properly allowed to go back to revisit the making of the pie. What he needs to do is to divide up on a contractual basis between the owner and the tenants. And that's what that's what didn't happen there. He his concept was this building is old and not going to last very long. And it may or may not. We all know about buildings that last that look don't look great or historic and go on forever. But this particular tenant made a contract with the predecessor to this owner to take care of that, to say, if anything happens to this building being taken by the government, for example, then I get my share. Now, is your position that he undervalued the leasehold interest or that he discarded it entirely? Well, he discarded entirely. We had we had experienced a real estate broker, real estate appraiser value at four hundred and sixty nine thousand dollars. We didn't get a penny. So was that testimony in front of him? Yes, absolutely. And it looks like my time has passed here. Very fine. Thank you. Mr. Berwanger, is that correct? Good morning, Your Honors. My name is Charles Berwanger. I'm with the firm of Gordon and Reese. And my clients are Josephson Management Company and JS Foods. If it pleases the Court, Your Honors, the my view of the case to give emphasis to what our message is, is that Judge Singleton erred in two ways in reading paragraph twelve point three to our lease. And we have a different lease than Sushi Deli. He erred because his reading rendered half of the language of twelve point three surplusage. And if I may, if I'd like to reserve, say, two minutes to respond to Mr. Dole, his reading rendered half of the language of twelve point three surplusage. Plus, he read into the provision language, which is not fairly imputable to the to the twelve point three. He read into twelve point three a requirement that the government must be the payee, the condom nor. And he read read into the provision, the law of inner domain. That was not the intention of the parties. That is not the way the language reads. And if I may just focus for a second on the language, Josephson insisted. And we've highlighted for you in our briefs the negotiations that took place in 1988 in which Mr. Josephson was looking towards building a Burger King and a dilapidated building. And he wanted protection for his six hundred and seventy thousand dollar investment. So he insisted that, and this is twelve point three, that tenants shall receive a sum attributable to the undepreciated value of FF&E and TI's. That phrase undepreciated value is is is pivotal. Four elements compel the conclusion that it means cost. The tenants cost in putting those improvements in not value depreciated by wear and tear and obsolescence. First, undepreciated means you don't take anything away from it. We have cited in a reply brief of pages 15 to 18, the American Appraisal Institute's analysis that I think bears on the question. And there's also a California Court of Appeal case that also lends credence to our analysis. Undepreciated value means cost. Secondly, paragraph 15 provides for an award, pardon me, a payment by the landlord to the tenant of the undepreciated value of the business. Again, the same concept. But it makes it clear that the amount of money we're talking about is very significant. It puts a lid of one point five million dollars on the landlord's obligation. Now, that's relevant to twelve point three because it means the parties understood that we're talking about a whole lot of money. We're not just talking about the bits and pieces that you get an eminent domain proceeding as occurred here. We're talking about the landlord paying money. We're talking about cost. Thirdly, the landlord's interpretation. I've lost track of time. The landlord's interpretation renders the award zero. That's the necessary consequence of the application of the landlord's formula. The landlord's reading of twelve point three. And indeed, if you take back the reading to 1988 when the lease was written and after Josephson spent some money, a whole lot of money, Josephson would have been entitled to zero as of the execution of the lease and the spending of a whole lot of money to improve the premises. Final point, given that the undepreciated value means cost, necessarily the money has to come from the landlord because there is no law. There will never be any law that a governmental agency in an eminent domain proceeding has to pay under cost. That's just not the way it works. So necessarily, twelve point three contemplated that the landlord would pay the money, the cost. In other words, you're saying that these provisions were not meant simply to codify existing law. These were specifically negotiated provisions made between the landlord and the tenants as part of the decision as to whether to locate there. Precisely. We're not we're in the world. We're in the world of contract law now. We're not in the world of eminent domain law. That's my reading. Thank you. You're very welcome. Your side is almost ten minutes left, so you can. Thank you. Let's hear from the landlord. Good morning, your honors. I'm Hodge doll doll and doll representing S.D.H. and I'm being helped today by Thomas Garson, Esquire. This is a brief observation with some levity. Maybe after hearing argument, it may have been this case should have been entitled the United States versus Marie calendars, because it is indeed about a pie and it's about what's in the pie that's important in this entire case. Where I think appellants go wrong is here in the first part of an eminent domain. You all are entitled to present evidence that there is value to this package, to this pie. As this case turned out, only two parties chose that option. Only S.D.H. properties, the owners of the property and the government chose to present evidence that there is value to the property. Wait a minute. We're not involved in reviewing an eminent domain proceeding. Here we're interpreting the provisions of leases. And I don't see how there's any duty on the part of these tenants to somehow participate in an eminent domain proceeding. They have no claim against the government. Well, your honor, here's here's here's my point. Everybody who's a defendant in an eminent domain case has a claim against the government. For example, these tenants got fixtures and equipment paid for by the government. That was a claim against the government. And my my thesis is if you're going to say the building has value, neither the owner nor the government believe that, nor did their appraisers. If you're going to say the building has value, you must present evidence that the building has value. This judge was faced with reading appraisals that said the building had absolutely no contributory value. And therefore, the pie had no ingredients that would pay for fixtures, for brick in the in the ground. There was nothing in the award for those things. So if the contract between these parties was a special contract that had nothing to do with eminent domain, that is whether the reward contains anything for the building, even though we know you put a lot of money in the inside of this building. But I'm going to say as a landlord and S.D.H.'s predecessor may have said this. I don't know why they put it in a condemnation clause in a lease. But if S.D.H.'s predecessor said, look, no matter what happens, whether there's any money in this condemnation award or not, I will nonetheless pay you exactly what you paid for what you put into that restaurant. Well, isn't that part of the negotiating process? Your Honor, it may well be. I mean, the mystery is why did they put it in the condemnation clause? Why did the words allocated to come up all the time? Why did the words awarded for? The government awards, allocation is of an award. And if there's nothing in the award. Here's what's bothering me. I'm looking at 17B of the Sushi Deli lease. And it says all awards for the taking of any part of the premises or any payment made under the threat of exercise of power of eminent domain. That's what we have here. Shall be the property of both the landlord and the tenant in proportion to the respective possessory interests of the premises, whether made as compensation for the taking of the fee or severance damages. I mean, that's a pretty clear statement. Is it not that some port, some part of what the landlord receives because the United States is only dealing with the landlord, has to be allocated between the landlord and the tenant. I believe that is correct. That's what that says. But let's go on to what the evidence was. The evidence was. What I am entitled to, Sushi Deli says, is I'm entitled to the value of occupancy of this property, which is below the market. And they presented an appraiser who indeed testified the value of the property occupancy is below the market. The judge did not believe that. He did not believe the testimony. Did the judge singleton specifically make findings of fact with respect to the value, the bonus value of the lease? Yes, he did, Your Honor. I think that would be most clearly pointed out in. Give me just a moment. I believe page. 0 1 8 4 of the record is the quote of the judge's decision on that issue. Whereabouts in footnote 10 is where I'm seeing it. All right here. Well, I'm not sure where the finding is. Consequently, both the U.S. appraisers and the land appraisers landowners appraisers concluded the fair market value was its land value less the cost demolition. I don't think that tells us anything there, does it? All right. I may have misspoken. Let me find a place where I. I do have it marked, but I just have to find. Yes, thank you. Your Honor, on page 0 1 9 for the conclusions. Finally, the court finds that none of the tenants have proven a true bonus value to have been included in the condemnation award. The building which housed the leases was obsolete. But that's not a finding, is it? With respect to what the value is. He's not saying the value of zero. I believe he is. You believe he is. I believe he is. Yes. Well, we'll have to wrestle with it. Yes, I believe that's exactly what he's saying. I believe he's saying my perception from the evidence is that the tenants were paying fair rent for the building they were leasing. There was no bonus. There was no premium. That's my interpretation. All right. Now, would you apply the same principle with respect to twelve point three and the other lease? Now, the language there is different. I guess I have two questions. First, from the landlord's point of view, was there a reason why it would be different in one lease compared to the other? Or are they both meant to deal with the eventuality of a condemnation? Well, every lawyer or group of lawyers tries to write condemnation clauses differently, and they're a bear to write. I know I've tried many times to write them, and you have to be prescient to be able to foresee what comes up in condemnation. But I think it was a result of just the differential of lawyers and parties. Well, from your point of view, from the landlord's point of view, what was trying to be accomplished in either 17B or 12.3? What's the overall effort here? What's the purpose of it? I think the overall effort was, number one, that the tenant, if they did occupy the premises for less than fair rental value, should be entitled to receive the difference as measured by the capitalization of that difference. I think that's what a good lawyer would try to get for any tenant. If you've got a deal on a lease and you're in there at a bargain rate, you have value in your right to continue to occupy the premises. And that value should theoretically be awarded in a condemnation award, because most condemnation awards give you value for the property, meaning the building and the land. It is peculiar when a condemnation award does not give you any value for the building. In fact, it gives you a disvalue for the building. It's a case where land values go skyrocketing, and no reasonable developer or buyer would pay you anything for the building. In fact, they would deduct what it costs to knock it down. And therefore, the sticks and stones really don't lend value to the package, and therefore, in the award, it is not reflected. I think as to Josephson's, where they wanted to be paid for dollar for dollar for every improvement they put in the package, I frankly think that was an interesting provision. I think had you taken it out of the eminent domain clause and said, look, this has nothing to do with a condemnation award, if anything happens that we're dispossessed from this property, you, landlord, agree to pay me everything I put into it. It doesn't matter when it happens, the last day of the lease. If a landlord wants to make a deal like that, then he's got a personal obligation to do that. I don't think it's in RAM. I don't think it has anything to do with the real estate. It's a contractual obligation. And an interesting question is whether that passes on to a creditor who takes this piece of property in a foreclosure. What about this sub three compensation for loss of goodwill to the extent proven by tenant? What was the showing there? Well, we wrestled with that. And of course, our position was since the 1970s, when California legislature finally gave into a lot of pressure that the business people were making, particularly in redevelopment areas where their businesses were just being ousted. It allowed recovery for compensation for goodwill. So all of us that practice in the field did our paragraph on every lease we wrote. Said the tenant gets goodwill if he lost it and can prove it per the code. You have to show that you tried to relocate, et cetera. That to me was one of those typical paragraphs. And a clue that they were addressing California law is that later in that same paragraph, they talk about moving costs percent of government code such and such, which is peculiarly California. It is the California government code which provides for the moving costs. So the evidence to me shows that they focused on California law. Did they think, well, what happens if a federal government condemns this and federal government does not award goodwill? I don't think so. Well, it doesn't seem to be limited by that kind of interpretation. It's pretty flat out, isn't it? Well, it is flat out. And it shall be entitled to receive the following compensation for loss of goodwill. If I think it's as if proven extent, proven, proven. And I guess my question was, what was the showing with respect to that? Was there an appraisal? They had appraisal testimony, yes, that indicated a sizable loss of goodwill. But what the judge had to wrestle with here is the second phase of this eminent domain proceeding was theoretically to dole out the award. And he had to wrestle with the fact that the owners did not get, nor did anybody get, a goodwill award from the federal government. I think I think the judge did find that goodwill is not. In fact, he went he ruminated for quite some time in his decision and indicated that he would like to award goodwill. And finally went through the cases and came to the conclusion, your honor, that the federal law just does not provide for goodwill in a condemnation. And was that wrong? I don't think so. We look very hard because it. Exactly. If it were wrong, you should remain because it has nothing to do with the owner. The owner gets no part of goodwill. It's strictly an issue between the tenant and the U.S. government. I still have five minutes and 43 seconds, but I think I'm going to. There is no court rule that requires you to use. I'm out of gas. Thank you, counsel. Mr. Goble. Thank you, your honor. I think you're getting a good roadmap of this, but I just would like to reinforce the confusion of the trial court by referring to page two. I replied brief, which has a bolded quote from the record in which he pretty much lays out what we're what we're saying. And then 10 pages later in the record moves off to something else. Reply brief from the center in the center in the bowl. And basically, what should we be looking at on that page? He's saying that this idea about the building not being worth anything is not something that the tenant ought to bear. This tenant made a contract to protect herself over time as she paid her rent and approved the property and did good business there and enhanced the property. And she was wise enough or attorney was wise enough to put these provisions in the in the in the lease as a contract. Now, the judge seemed to get very easily jumped to the conclusion that this this building is it is worthless and it's going to go away. But bear in mind that at the time he was trying the case and he was visiting judge to building really been taken by the government and been in possess for the government was unoccupied. Who knows how long this building could have gone and serviced this restaurant? Well, in the future, through the end of the lease, at least, had it not been for the taking. And my client testified specifically that there was knowledge that this building, this this large building was there for the taking for the government. Right next door to the existing courthouse. So it was a it was a target. And it was this building could have gone on for a long time if there was any incentive to do so. But there was there was a cloud of condemnation hanging over the top of it. So I think, again, the judge was way, way off base on that one. And I would certainly say at a minimum of the matter ought to be remanded. If you look at the decision, give me the specific rationale to remand is what? Well, my preference would be for the court to find that there's no need for remand because there was only one. There was only one appraisal on on the bonus value. And that's was four hundred and sixty nine thousand. And you and the award that you reverse. And we can't make a finding of fact at this level, can we? Well, it was it was it was not contested. There was no opposition to it. Once you once you reach the legal issue that the building this was a contractual matter and meets the requirement, then you can it's simply saying there is no there is no opposition to this. All right. But there was another point I wanted to make. At any rate, the. What was the amount of that showing? Four hundred and sixty nine thousand dollars. But again, it's a small fraction of the total take that was paid to the to the owner only. We got the pie here and the owner took the whole pie home with him. And these people were the cornerstone of this building for many years. Well, except for the leases, doesn't Mr. Dole have a pretty good argument in terms of the analysis of this from the standpoint of just eminent domain law generally? Well, I don't know. The leases are what the case is about. I mean, that's like saying I realize I'm going to take away the case. In turn, in general, I think it's sort of what I started in the first place. You have two phases. You make the pie and then you distribute the pie. In this case, we have clear, clear leases. That's that's on a contractual basis. Tell us what to do. At least my Arley's does tell you exactly what to do. So we get a radical portion of what they are, what the landlord gets. Thank you. Thank you, Mr. Bill. Mr. Verwanger, you have some time. But first, I would reemphasize that this is a case about leases and contracts. It's not a case about pies or eminent domain law or the like. Mike? Help me recall. The United States is technically a party to this proceeding. Is this still part of the original eminent domain condemnation case? I think only because Judge Singleton, I think through ancillary jurisdiction, determined to address the lease contract issues and determine the claim made by my clients against the landlord. So I think we're an add on to the interim proceeding as Mr. Dahl referred to it. All right. Have my client desire to be bound by the rules of eminent domain. Half of twelve point three would not have been written. Secondly, as far as numbers are concerned, my client invested six hundred eighty five thousand one hundred sixteen dollars in furniture, fixtures and equipment and tenant improvements to make the four thousand four square four thousand four square foot restaurant work. And the testimony and that was uncontested in a testimony by my clients. Again, uncontested was that my clients lost three hundred seventy thousand dollars of goodwill generated by the twelve years of operation at that site. And that too was uncontested. Counsel for the landlord, I guess, posits the issue. Well, the extraordinary provisions, as I described in twelve point three, are contained in an eminent domain provision. The answer. Well, the reason for that is my client was concerned about the concept of a taking. If my property is taken, if I lose my restaurant, I want to make sure that I have guarantees of restoration of my investment in a provision that deals with what do I get if the government comes along and takes the property. We did not intend to incorporate eminent domain principles into twelve point three, rather contract principles ensure full compensation for my client's investment. And that's entirely proper. The. There are two other provisions that also bear emphasis that the primary focus of the negotiators of the lease was to ensure that the restaurant either continued in place or had enough money to go somewhere else. Twelve point two deals with partial takings. And there the landlord is required to invest the entirety of any award into restoring the restaurant. Twelve point four deals with temporary takings. And there my clients required to restore to pay any money into restoring the restaurant to ensure, again, continuity. So these 15, again, again, deals with redevelopment. Even though Judge Singleton may have found that the building was old, the lap data falling apart. Nonetheless, the parties to the my client's lease contemplated possible redevelopment. And they provided for a mechanism to ensure that my client would be compensated should there be redevelopment of the hotel. Mr. Dole made a comment that all of the parties to the condemnation proceeding had an interest in it. In other words, I assume this was the United States versus the owner of the building. And separately each constituent property holder of an interest in that building. First of all, is that correct? To that extent? I guess interest. We certainly had a real property interest. Yes. But was the value of your real property interest entertained as part of the government condemnation separate from the lease? Actually, the lease also addressed that to some extent. We gave up as part of the negotiations in 1988 bonus value. So that's an express. We gave that up in return for the other parts of 12.3. Secondly, we did receive $40,000 for the, I guess, class 2 fixtures, which was compensation provided for by the rules of the road and eminent domain, but had nothing to do with 12.3 and our rights against the landlord. That was a direct government award. That had nothing to do with any claims you might have against the landlord. Correct. But I do think that the $40,000 is an offset against the payment by the landlord of the cost per 12.3. Another point that counsel made was that the contract obligations I allude to may not have passed to his client. And that issue is brand new, has not been raised before. And I have two seconds. And thank you very much. All right. Thank you very much, counsel. The case just argued will be submitted for decision. And this panel will adjourn. All rise for discussion and adjourn.
judges: Boochever, Hall, O'Scannlain